The argument next this morning in Case 137 on our original docket, Montana v. Wyoming and North Dakota. General Bullock. Mr. Chief Justice, and may it please the Court. The Tongue and Powder Rivers are the only significant water supply in a 10,000 square mile area in Montana and Wyoming. And this Court is being asked to decide whether the Compact allows Wyoming to take the return flows that Montana farmers in that area have always relied on or instead affords protection to both states. Our exception should be sustained for three reasons. First, the plain language of the Compact preserves the water supply each state was receiving as of 1950. Second, contrary to the Compact's purposes, the master's interpretation would allow individual water users to alter those amounts. And third, the master's policy determinations about efficiency add ambiguity to the principles underlying a century of Western water law. General Bullock, would you please point to the precise language of the Compact that freezes consumption as distinguished from the amount of water diverted, freezes consumption as of January 1st, 1950? Yes, Your Honor. In the Compact, it's at the appendix of the master's first interim report, two areas. First, that the preamble provides for an equitable division apportionment of the water, and then the operative provision, Article 5A, states that the uses existing as of January 1st, 1950 in each signatory state shall continue to be enjoyed. Well, the uses existing is irrigation. I don't see where it says, and so I can understand, the amount of water diverted can't be increased. Your Honor, the whole of Article 5A and 5B, I mean, no one can test that it's a full allocation of the water. So 5B is water after 1950, 5A is prior. And in order for the status quo to be remained, for the appropriate rights to beneficial uses existing in Montana as of 1950, there needs to be a water supply. And also operative to that, it's within the definitions that Article 2H is beneficial use. And that's a derivation or departure from the general prior appropriation law, because it's that use by which a water supply is depleted when you use it. Kennedy, and this is not too helpful, simply restate the issue before us. What is a beneficial use by the upstream owner? Well, Your Honor, it need not, because in Article 2H it defines what a beneficial use is. And that's that use by which the water supply of a basin is depleted. And it's that depletion that as of 1950, so it wasn't a full consumption of water in Wyoming, and that depletion is the return flow upon which Montana is relied. Sotomayor, that's the essence of the argument before us. The depletion was the amount of water that was taken from this water source to irrigate the crops. The issue now before us is whether beneficial use means consumption or it means use. Isn't it? You're begging the question in my mind. Because I don't — what source do you have for the fact that a return flow is beneficial use? Your Honor, the return flow is the basis of Montana's water right. So that the return flow under the compact isn't actually beneficial. That's not actually true. Sotomayor, their water right was the beneficial use that your pre-1950 consumers used, meaning you had consumers who were irrigating their own crops, who were doing other things with the water. The rights protected are their pre-1950 uses. You're putting — you're still equating consumption as being their use. But I don't know where you get that equation from. The equation, Your Honor, that consumption is the same thing as — As use. As use. Well, we could go actually to the special master, who himself had stated that when exploring — I mean, beneficial use reflects the historic consumptive use. It's from his own textbook. It's on page 82. The master says that a senior's right is limited to the amount he originally beneficially applied and consumptively used, that is, the amount received at the point of use minus the runoff.  It's an open question, Your Honor. Yes, they certainly could, but not if it impacted a downstream appropriator as per this comment. How in the world do any States monitor that? The change in crops, the change in irrigation methods, the change in anything that would cause a difference in return flow. Let's assume global warming in some form or another evaporated more water. And so some crop area did some solar heating that caused a greater evaporation. Is that a breach of the contract? So two questions embedded in there. How does any State monitor that, the change in crops or change in irrigation methods? And second, how far does it go in terms of the pre-1950s right to use their water? To the first question, Your Honor, even as of 1950, the drafters recognized that this was a fully appropriated river. It had reached its maximum practical limit. So each individual downstream knows how much water they should be getting. I mean, we have 80 years of measurements on one of these rivers alone, and you could go online right now and find out what the flow is at the State line occurring as of this morning. So piece of it is that this is something we've been doing for a long time in the West as far as knowing what water is in the river, where it is, and throughout, you know, downstream appropriation. To the second question, we're not sure. But all that shows is, or might show in a particular case, is that the amount of water is reduced. But then the question is, have the senior appropriator or the upstream appropriators reduced it in a way that's inconsistent or that's an overuse of their beneficial rights? And again, right back to where we started from. And then you have to regulate exactly how each irrigator is using the appropriative right. And, Your Honor, you don't have to. So the flows don't necessarily answer the question. Well, Your Honor, it's ultimately up to each State to administer their rights and their water intrastate. But this is compact among sovereigns. So what we need, what Montana needs, is to get that supply of water that it was receiving as of 1950. But you gave up this. We've been talking about beneficial uses. What the compact said, says, is appropriative rights to beneficial uses. And to me, that suggests, which I always understood to be the way water law worked in the West, is you have a right to pull out, you know, water. And the appropriative right is you have the right to take out however much you were taking out. And the fact that less comes back, that's something different. That doesn't affect your appropriation. Your Honor, even at the time of the compact, that Wyoming recognized their paper rights, that appropriative right was much more than the actual use occurring. So you can't read beneficial use out of, especially under this compact, that in any, even under the general common law, you only have an appropriative right to the beneficial use. And all along the country, the beneficial use is irrigation of crops. They have an appropriative right to take out so much flow for that. That's all they're doing. They're doing it now, just as they were back then. They just use up more of it once they've taken it out. Mr. Chief Justice, two things. First of which, the beneficial use is, I mean, we can't read this definition of beneficial use out of the contract, or out of the compact. And it is a contract, actually, among States. And also, though, second of which, though, that it's also a fundamental tenet of prior appropriation law, is the downstream irrigator takes, given the same conditions, as when he first got his or her right. Breyer, given the same conditions, but is there any evidence, or can you say anything from the record or any other place, going back to 1950? I assume in 1950, people knew how much the different landowners were taking out of the stream of the river in Wyoming to use for irrigation and other such purposes. They knew that. Is there any indication they knew at that time how much each individual landowner was putting back? I think the answer is no, but I'd be very interested if it's yes. And I think it would help you a lot if it's yes, because I'm, to tell you the truth, I'm pretty skeptical of the fact that they're writing an appropriation right into this about to regulate something they don't even know about. Effectively, Your Honor, it could be yes. I didn't say it could be yes. I would like you to tell me if the answer is yes, and then, of course, I'm going to ask you where in the record I find something that says that they knew how much each individual landowner is putting back into this river in Wyoming. And I think you can't answer that question. I certainly cannot answer that, and they didn't need to know from the perspective. Well, they didn't? In other words, they didn't know how much is coming back, but you're coming in and saying what they were regulating here is they're saying not only do you have to maintain a right to take out 100,000 units to do your irrigation, but you have to put back 80,000. But they didn't even know what the number was, whether it was 80, 70, or 60. And the appropriation law is ambiguous. I think I can go that far with you to say it's ambiguous, but I don't see how I can go further. I mean, that's my basic question. Do you see what it was? Was I clear? I'm saying, how can you read this treaty to require landowners to put back amounts into the river that they didn't even know what they were? First, Your Honor, the individual landowner does not have to put water back in that they didn't even know. What they do need to do is make sure that the beneficial — the appropriative rights of beneficial use is existing in both States. The Solicitor General pointed out that we don't break up 5A and 5B and put one group priority over the other, that existing as of 1950 in both States shall continue to be enjoyed. So the only way that we can continue to enjoy the rights in Montana downstream is to ensure that we have the water supplies that we have. Scalia. You say you get the same amount of water and it's up to Wyoming to figure out who they have to cut down for not putting back enough to meet that amount. You don't care what private owner it comes from. It's up to Wyoming to figure out who has to be cut back. Your Honor, I don't say we can't help you. Yes. Sorry? Yes, I think that is — the answer is yes, isn't it? Yes. But, Your Honor, we don't say the exact same quantity of water. We say under like water supplies. Under like water supplies. Yeah. And could you tell me that I didn't get the page of the Special Master's report which you asserted adopts your definition of beneficial use? What page was it? I thought you referred us, just while you were answering the note, to page 82. And there's an intriguing footnote where the Special Master talks about his own book. But that doesn't seem to me to be conclusive on your point, because he's saying the area is confused. And his point, it seems to me, brings up what the Special — I'm taking over your answer to Justice Scalia's question. It is page 82 footnote. Footnote 15. Yes, Your Honor. Or the footnote on that page, yes. And there he's talking about. It seems to say what you say it says. If your understanding is correct, would the result be that landowners in Wyoming would only be allowed to consume as much as they consumed in 1950, but landowners in Montana could take advantage of improved irrigation techniques and use much more of the water? They could divert the same amount of water, but they could use much more of it. No, Your Honor, that would not be the case. Well, why wouldn't it? First, for the irrigators in Montana, I mean, one of the things, Montana sought to have a system of interstate administration. Montana, or Wyoming, through storage, through curtailing consumption by post-50 users, or otherwise, can administer its water rights in however it so deems. So ultimately, that's a decision of the State of how it administers the water rights and the consumptive that amount that it has. For Montana, we can't increase consumption any more than the water that we would have received at that point. So to the extent that Montana allows an individual irrigator to go to 100 percent consumption of its water right, then in our system in Montana, we have to deal with what's going to happen to the subsequent appropriator right downstream. And what happens under Montana law? Under Montana law, if there's an injury, and that's actually — and the Special Master pointed this out in another one of his footnotes, that that still would be actionable, like a change from flood irrigation to sprinkler irrigation to the extent that it deprives a downstream user of waters that they're relying on, that they could bring into action. Scalia. But your people can do that. Your people can get more use out of the same amount of water diverted by going to sprinkler irrigation, whereas the people in Wyoming can't. That's a little unfair, it seems to me, right? Both can, Your Honor. I mean, that is, I guess, a presumption is that we would have the water to use it. And Wyoming is actually getting a lot more production by consuming a lot more of the water within its right. Scalia. Your people are entitled to take out the same amount they took out before, right? Pre-1950. Under like-water supply conditions. Whereas the people in Wyoming, you say, are not entitled to take out the same amount. They are entitled only net the same amount that they had before. Whereas downstream, your people can take out the same amount, and whereas before 20 percent of it used to go back into the stream, they can now make use of that whole 20 percent through sprinkler irrigation, right? It gives you a great advantage. I mean, maybe that's the way it was written, but don't tell me that this is even-handed. I don't think that it does give us a great advantage, because we still have to deal with the same amount of water supply that we would have had. So at that point, if we switch to sprinkler irrigation, the first irrigator does that, there's going to be a shortage downriver, unless we make it up through additional storage or other causes. So do you mean- Do you have some ultimate liability to Montana, pardon me, to North Dakota for overuse? We do a little bit, Your Honor. There's the picture of the basin, it's- Well, I won't get into that. But it does seem to me that the Chief Justice asked the question, if you're entitled to take the water, you can use it for any purpose. I take it the answer to that is it has to be a beneficial use, it has to be for approximately the same crop. But that brings us to this gray area that the Special Master refers to on page 82. It's confusing, and I think it was page 65, he talks about this as a confusing area of the law. What is your best authority for your position? What is the best authority? Do you have a case or a paragraph in a treatise that's- Yes, Your Honor. In 1992, the Utah Supreme Court framed the question, this Court's called upon to determine the applicable law when the use of new technology- If the Utah case is your best case. That's the only case that any of the parties cited that actually deals with the change from sprinkler or flood to sprinkler irrigation. And what that said is if the return flow goes to the same river as which it came from, that subsequent irrigators or downstream appropriators have the right to rely on that. And I guess I'd say that my second best case is the Special Master's own footnote. It's 6912, where he says that, you know, even though State change procedures don't typically apply to crop changes near proper irrigation techniques, this does not mean there's no way to challenge increases in efficiency. Downstream water users, for example, could sue to enjoin an upstream appropriator from increasing consumption or to force the upstream appropriator to replace last run. I would think your best point is not all of that stuff, but simply the definition section, which very clearly makes a distinction between beneficial use and diversion. And your point is that what is guaranteed is not the diversion right that existed pre-1950, but the beneficial use right, which is the net use of the water, not the total amount diverted. If there were not both of those definitions, it seems to me it would be a little – your case would be a little harder. But with the two of those definitions there, and with 5A using beneficial use rather than diversion, it could have said diversion, appropriate right to diversion, but it didn't say that. It said beneficial use. Well, why define beneficial use that way if you don't mean it? That's your best point, isn't it? I agree, Your Honor. I was trying to – I believe Justice Kennedy asked for a case or a treatise. So that's – but I agree that the plain language, and especially in an area where there's so much ambiguity, as the special master acknowledges, why change the status quo of what was occurring? I don't understand why that's a good answer. I mean, the beneficial use is that use by which the water supply is depleted. Well, the use here is irrigation. It doesn't say irrigation up to the technological development in 1950. They're still taking out the same amount of water for that beneficial use. They're using it to irrigate. And if they get better at it, so they use more. Well, that's just too bad for you. Your Honor, but they're depleting more from the basin, and that's – I mean, you can have beneficial use for nonconsumptive purposes. That's back where – that's where I was. I can't get too far. I mean, you have the word depletion in that definition. That might help you. But I'm thinking it's in accordance with the doctrine of appropriation. What does that doctrine, that legal doctrine, say about use and return? And that's why we're – why I was thinking it seems totally unclear. It talks about seepage, the cases, which I gather is different from return. Okay. So could they have really meant net? And what struck me is that they couldn't, which you were beginning to address to, is that they couldn't have meant net, because the water law at that time is unlikely to have meant net for the reason that they didn't – you don't know what's coming back. You see, it's not just – I see your point. Your point is, well, Wyoming knew how much was going into Wyoming. But that's not my point. My point is what's the water law? What's the law of appropriation at that time in respect to return flows? And if people didn't measure return flows in general, I suspect in an ambiguous area they would have analogized it to seepage, which is what the Special Master thought. Your Honor, the seepage cases, though, deal with adjoining landowners, not the same river flow. And the Special Master acknowledged that. That – and I guess what I was earlier trying to explain is certainly each appropriator knows how much water it would be receiving, what the flows typically are, and they all basically judge on it. But I guess if there's any ambiguity, and the law wasn't necessarily clear as of 1950 on conversions from flood to sprinkler irrigation, but what we were trying to do is preserve those uses in both States existing as of January 1, 1950. And we can't do that without a water supply. Other than the text, I think that the next place that one would look in interpreting Compact would be legislative history. And I think that the report to the Senate was real good in saying that – and this is part of – it's appended to Montana's brief response to the motion to dismiss the bill complaint. At 3A, it says, It's clear, then, that a demand of one State upon another for a supply different from that now obtaining under present conditions of supply and diversion is not contemplated, nor would such a demand have a legal standing. So what they were trying to do in 1950 is protect what each State was doing. Where is that again? Where are they? That's it. 3A of the appendix, Montana's motion, are the response to Wyoming's motion to dismiss. General, let's assume that you're right, that what was guaranteed was the same amount of water flowing into Montana as in 1950. And I take it you don't care how Wyoming deals with this. But what – if you're right, what could Wyoming do? You can't tell the farmers go back to the old way of irrigating or go back to a different crop? No. I mean, no, Justice Ginsburg, Wyoming could choose to reduce groundwater pumping. They could choose to curtail irrigation on post-1950. They could choose to release storage. I mean, they've built, I think, 15 new reservoirs in Wyoming since the date of the Compact. They could choose to release water from that to fulfill those rights. You say it doesn't – they don't – Wyoming doesn't have to know whether Farmer A or Farmer B is taking more than they took in 1950 – I mean, is using more than they used in 1950. They just have to know what the total amount is, and Wyoming can make that up anyway. Yes, Your Honor. So really – I'm sorry. The issue is, are both of you – both of you have pre- and post-1950 users? Yes, Your Honor. All right. And I guess this goes to the second question, which we've sort of not really addressed. The special master said, well, you could cut back your post-1950 users and satisfy all the needs of your pre-1950 users. Why isn't that the answer? Why isn't that an answer that should be respected? Because you can satisfy all of the pre-1950 needs that you have potentially. No, Your Honor, we can't necessarily satisfy all the needs. The drafters did say, even as of 1950, that this basin reached its maximum practicable limit for irrigation. And that's from the October – the last of the drafters' meetings. So the water supply as of then, without additional storage, had already hit that limit. And ultimately, what we need, though, is – I mean, each State will administer interest State, but we still should be able to rely on the ability to get a supply of water to meet those needs as of 1950 under like water supply conditions. Before any 1950 use – post-1950 users are permitted? We're still at the stage of discovery, but, yes, likely that's how it would occur, Your Honor. So why isn't this a premature lawsuit? Because I think really the essence of your claim is we need the pre-1950 water flow. We don't care who it comes from. And what all the special master said, in my mind, was the difference – you can't look to what the pre-1950s were doing in this situation. But I haven't addressed what the posts are going to do or have been doing and whether that's right, and that's depriving you of a water flow. I don't know if he answered that question. Are you, in fact, entitled to a minimum amount of water flow? That's really what should be the point of the issue, isn't it? It is, or that quantity under like water supply conditions. I don't think it's premature. We've tried to administer this compact, actually made calls in 2004 and 2006, and as a result of not getting the water, knowing, believing we're at a water short time, that's when we filed this action. I'd like to reserve my time if I may. Roberts. Thank you, counsel. Mr. Michael. Mr. Chief Justice, and may it please the Court. As the Court has identified in previous questioning, this case at this point and this may change various technologies in irrigated agriculture and change up and down, depending on the year and the fouling of land and that sort of thing, the amount of water that is actually consumed by crops. And I think the Court's identified that the critical fact that a water right, a classic Western water right, an appropriate right as in Article 5a, is made up of the right to divert an amount of water at a headgate in an irrigation situation, put it on a defined quantity of land, and use it for a purpose, irrigation, that's defined by the State. Wyoming's had such a system in place for many years and controls those issues, but does not and has not attempted to measure consumptive. But what is the controlling principle in answering the question that I think you properly put? Could these irrigators switch to something like rice, which absorbs a tremendous amount of water, or are they, when they switch crops, it must be reasonably close to the earlier beneficial use?  Is that the question? The standard is the standard of waste, practical irrigation. The standard of waste, not wasting water, practical irrigation. The irrigation right is a general right, and if rice were to double the amount of consumptive use by the crop, that would be permissible. If the previous use had not been affected by an abandonment action because the amount of water was being reasonably used for the former crop and the crop has changed. So it's not a question of percentage change. I thought question of the crop. Kennedy, I suppose the first crop absorbs 50 percent of the water and returns 50 percent by seepage. The second crop that they switch to still absorbs just 50 percent of the water, but because of the pattern, the other 50 percent just evaporates. The way that the water is – there's a basket, Your Honor. There's a basket that starts with a quantity that's taken at the head gate, 4 cubic feet per second, put on the field. And within that quantity, there's multiple – two components, basically. The amount consumed by the crop – I should say the amount consumed by the crop were depleted by other elements, ditches, seepage, other types of things, deep percolation into the ground. And the other component, which is water that's not lost but can return or go somewhere. It's not evaporated. There's no transpiration. So there's two components. And if that quantity, that division changes, that's perfectly permissible within the use of the water, right? And the reason for that was set out in Samuel Wheal's text in 1911, carried forward in text and cases ever since, that – and in the Binning case, the 1940 case in Wyoming, which is the water, while it's in the stream in the public common, is not under the possession and control, the personal property control of the irrigator. Scalia. But we're dealing here with a compact which has a text, and what the water law of Wyoming  And I am hung up on the fact that Article 5A says, Appropriative rights to the beneficial uses of the water of the Yellowstone River system existing as of January 1950. Appropriative rights not to diversion, not to diversion for beneficial uses, but appropriative rights to the beneficial uses, which is defined, which is defined in the compact, to say that use by which the water supply of a drainage basin is depleted when usefully employed. And it could have said diversion, but it didn't say that. And I notice that the government's brief uses, seems to use the words interchangeably depletion and diversion. They're not interchangeable. They're defined quite separately in this thing. And besides which, I find it implausible that Montana signed on to, well, we don't know how much water we're going to get. It depends, you know, upon how much stuff was flowing back before, but we're not guaranteed that that will be flowing back again. You combine those two things, and I don't know, what do you do about that definition? Your Honor, the definition has two components. The classic beneficial component that would come from a classic beneficial use definition, which is useful employment for the activities of man, a beneficial purpose, which non-wasteful purpose. That's the start. That's not how it's defined. That's the last portion. That's the second part. Oh, that's fine. The first part is use by which the water supply of a drainage basin is depleted. In the Western United States, a drainage basin, appropriable water is not all the water in the air and on the land and dropping from the sky. Appropriable water is water confined in a water course. The Binning case made that clear. Until the water returned from the field into a water course, it was not appropriable by the downstream use. So this definition, by using the water supply of a drainage basin is depleted. Kennedy, are you addressing the word depleted? I'm addressing the word supply of the drainage basin, and then it is depleted. Use by which the supply, the water supply of a drainage basin is depleted. Are you saying that depleted means only what's withdrawn, and it's not calculated by with reference to what is returned? That's correct. But also you're saying read it with different emphasis. Justice Scalia read it. Beneficial use is that use by which the water supply of a drainage basin is depleted when usefully employed by the activities of man. And you read it, by which the water supply of a drainage basin is depleted when usefully employed by the activities of man, so that it is a definition in respect to how you use it, not amounts. But if you emphasize the word depleted, it could be read as referring to amounts and not quality of use, not nature. Why don't you emphasize both of them? I'm willing to emphasize both, but you can't write out the depleted out of the – how does your definition of depleted differ from diversion? If you had a – It is a diversion for a beneficial use, the same thing as a depletion. May I give an example? In a river, the Tongue River, if there is a waterwheel, Montana allows water rights, the 1912 case, Hennessy v. Featherman, allows a water right to push a waterwheel. That water flowing down the river does not – is not diverted, and nevertheless, it would allow a water right. This definition differentiates that. In this definition, under the compact, a water that is diverted for agriculture that is diverted is a beneficial use. But there is a small segment of what could be a legitimate water right that is excluded under this definition. No, but, I mean, to do that, the definition would have read the term beneficial use is defined to be that use by which the water – that use for which the water supply of a drainage basin is diverted for useful employment by the activities of man. And that's not what it says. To the contrary, it makes a clear distinction between depletion and the previous definition of diversion. I just – I'm just trying to give that stark difference some effect in the later section 5A. Let me say this, Your Honor, if I might. The – you will find in the compact, in Article 5B, the use of both diversion and beneficial use. Okay. And so we have two – those terms are both used. And in 5B, the drafters made a distinction. They said direct diversions or storage would be covered by 5B, and then they said how diversions are counted. And in C, it talks about diversions. What part of 5B are you talking about? I'm talking about at the bottom of 5B when you're talking about the three third-tier rights. The point of measurement shall be below the last diversion? No, 5B. In the first text, the first paragraph of 5B, towards the bottom, the text says, and the remainder of the unused and unappropriated water is allocated to each State for storage and direct diversions for beneficial use on new lands. For the – Exactly. I mean, there it talks about diversions for beneficial use and not the payment for beneficial use. I mean, I think that's something different. Counsel, could I – Your Honor. Could you answer? Do you see a difference? Finish that, and then could I just clarify something from what you were just reading? I think there's a difference in that the – in practical terms, the depletion – the depletion in the beneficial use definition, a diversion would be the only way to deplete that. And that's what – that's the point. The only way to make it through a depletion – So once again, you're saying that depletion is a calculation of what is taken without reference to what returns. Yes, Your Honor. Oh, so when you – and your best authority for that is? The best authority, I think, is what the Special Master's discussion of this, that the only practical way a water supply of a drainage basin would be in the quantities of water in the rivers themselves would be – depleted would be through a diversion. There's really no reason to make a distinction. Just to follow up on Justice Kennedy's point, because I think it's important. So you were reading, when it says is depleted, you think all you have to show is that it's less than when you start it. And once that is shown, it is depleted, then you're saying, well, we can deplete as much as we want. Yes. Depletion would be moving it from this glass of water, if that was the river. Yeah. And it reduces the quantity of water in the river. And you don't care how much. You're saying, well, this is a beneficial use because it depletes some of the water, it takes some away. And once we've gotten over that hurdle, all bets are off and we can deplete as much as we want. Yes. And of course, when we get to the point, wouldn't the normal word be divert? It may well be, Your Honor. There's some problems with this definition. It self-defines itself using usefully twice. So we have some drafting issues with this. Sotomayor, could I go back to my question, which is twofold? The first is, the Solicitor General recommends that we defer the decision on remedies in this case, and Montana seems to agree. Do you agree as well? The second question presented. That has been deferred, is my understanding. It has. My problem with this is, and I think I need to understand what the fight is about here or what the dispute is about. It really does seem to me that it is a question of remedies, not about whether you're taking more water rights through irrigation or not. If I understand this compact right, both of you are protected in your pre-1950 beneficial uses. Each of you appear under the terms of Article V to be entitled to get enough water to fill those uses. The next section, the one that you read earlier, lets you use things in the future for post-1950 uses, but only if the water supplies protected pre-1950 beneficial uses have received all they're entitled to. Neither of you are entitled to take anything post-1950 until pre-1950 is protected. That's how I read Article V. Am I reading it wrong? Because it seems to me that the only time that we get into a dispute, and this is the may be right about ultimately, is it's not a consumptive compact, but it's a use compact. And both of you are entitled to get a full, that's what I'm reading Article V to say, to get enough water to satisfy the beneficial uses before anybody's entitled to post-1950 water. Tell me what in the language of Article V suggests something different than that understanding. I disagree. The language in Article V that disagrees with that is the very first two words, appropriate of rights. Appropriate of rights do not guarantee that any water user or any group of water users will be satisfied. 1934 was a horrendously dry year in the Basin. Fifty percent, the flows were 50 percent less than normal. In those kinds of years, the river dried up that year in parts of the river.  Sotomayor, but this is not happening today, is it? There's a number of years. Oh, yes. It happened in 2004. All right. But that's an isolated year. In most years, are you putting water to post-1950 uses or not? Have you been regularly putting water to post-1950 uses? Both States at times. Yes, last year all the post-1950 uses got satisfied. It varies widely. But the point is that only the appropriate of rights, which is not a guarantee of a quantity of water. So the first clause of the compact, Article V.A., does not establish a quantity of water. And there are many compacts that do this. They establish a quantity of water. And they do it quite simply. I don't disagree. But as I read the article, it says, You put all the water that's available to pre-1950 appropriated uses. You then go, as I read the second part of this article, to any water supplies that each State has until you fulfill those 1950 appropriated uses. And then it apportions between the two of you post-1950 percentages of the excess water that you're entitled to have. Am I correct about that, Judge? Yes. And on an ongoing basis. It's not a quantity. None of this is done in quantity. It's all done in a system that's dynamic. But that's why I do understand the remedies were deferred. But to the extent that we were to rule that appropriated rights included the right to change irrigation methods or crops. We don't have to reach crops because that's not an issue here. In the end, you're only entitled to take the appropriated uses, including irrigation rights, that existed pre-1950. Are they entitled to get as much water as necessary to satisfy their pre-1950 rights or not? No. Before you can use post-1950 water? Yes. Yes, before. On those particular days. On those particular days. Why? If there are pre-1950 rights in Montana that are not satisfied on that river and there are pre-1950 rights in Wyoming, the special master has ruled contrary to Wyoming. Why aren't you taking more of the percentage that way of post-1950 waters? The compact says post-1950, you can take whatever percentage it was. I've forgotten what percentage that might have been. Whatever it was. 60 percent. 60 percent. They're entitled to 40. Does that mean you can take 100 percent because there happens to be more water that they can satisfy the pre-1950s users with? Why aren't they entitled to their 40 percent of whatever that big basin is so they can give more water to post-1950 users, that they can exploit their full 40 percent? Your Honor, I'm not following because there's a distinction between each class of water. Yes, I understand that. And in your question, I'm not following which class you're referring to. I'm answering this only, I'm asking this because I know we've deferred decision on the remedies, but for me that is so integral to the issue here because when they talk about being entitled to a water flow, I see that as being entitled to a pre-1950 satisfaction of water needs or beneficial uses before anybody gets post-1950 water. And so I see the only issue before us, because remedies have been put aside, as to whether the beneficial use includes some percentage increase because of irrigation demands, but so what? It just means it's going to limit post-1950 users. It's not going to limit the rights of the pre-1950 users. Everybody's entitled to change their irrigation methods. Everybody's entitled to change their crops. They appear not to be entitled to put the water to a new use, whatever, however that's defined. We don't need to get there today. But I'm not sure how you're entitled to post-1950 uses while they're still not satisfied in 1950 use. We, Wyoming is not entitled on the same river to take post-1950 water when there is a pre-1950 use in Montana that's not satisfied. The special magistrate has held that. The pre-1950 user. I'm sorry. The special magistrate has recommended that. And I think the Court actually has granted that. Roberts. Just before you sit down, what makes you think we've deferred the remedy question? It's presented, it's been briefed. I don't know why you think we've deferred it. Whether or not Montana has to take care of intrastate uses, that's what I understand the remedy question to be. You briefed it. Well, my understanding was that the Court had simply sent it back to the special magistrate for further consideration. That's all. Well, thank you. Mr. Jay, maybe you can help clarify something. The second question presented, which involves what Montana has to do before they reach it, that's still before us, right? Mr. Chief Justice. I know you don't want us to reach it, but it's still before us. Mr. Chief Justice, and may it please the Court, the Court entered an order stating that it would hold oral argument only on Montana's first exception and that the second exception would be recommitted to the special master. So for that reason, the parties have addressed only the first exception in this argument today. Could you put your brief before we entered that order? Sotomayor said the special master was right, that they have to satisfy their needs from pre-post-1950 users. Why? Aren't they entitled to their 40 percent of how much excess water there may be after their pre-1950 users have been satisfied in full? Doesn't this compact say both of their pre-1950 users have to be satisfied first? Both of their pre-1950 users have to be satisfied first, yes, we agree with that, so that no one in Wyoming is supposed to be taking post-1950 water until pre-1950 users in Montana are satisfied. We agree with that. The point on which the Court has sent back to the special master is what happens if pre-1950 users in Montana are not satisfied, but they could be because Montana post-1950 users in Montana are also diverting water? But what we think the question squarely before the Court here is whether the right to recapture water gained from increased efficiency is part of the pre-1950 appropriative right, and that matters when there's not enough water in the river for both States to satisfy their pre-1950 appropriative rights. Forget about post-1950s. There's not enough water for both. Breyer, in that situation where there isn't enough for all the pre-1950 people, it's Wyoming that gets all the water. And on their theory, it's surprising, surprise, surprise, it's Montana that gets all the water. And there's no way to read this contract, this compact, so it's share and share alike. Both States have affirmatively rejected the idea of a middle ground like that, Justice Breyer. There's no fair way to decide this case. Well, Justice Breyer, we submit that enforcing the compact according to what the States signed up for is fair. It's fair. Precisely. And I always thought in addition, that's kind of the way appropriation law works in the West, right? I mean, the person who gets it, gets it. Provided the person who doesn't get it gets it. No, I mean, I don't mean to be, isn't that the difference between Eastern water law and Western water law? In the East, you try to allocate everything fairly, so everyone's treated fairly. I thought in the West, for reasons of efficiency, it's first come, first served. And here, the States decided not to do that on an interstate basis. They said that all pre-1950 users would be on the same footing as between the States, so that Montana cannot complain if, as long as Wyoming's water users, pre-1950, are not exceeding their pre-1950 right, Montana has no remedy and there's no breach. They concede that on page 20 of their server. Mr. Jay, I thought that the special master, very important to him, was the meaning of appropriative rights. And he said that the Wyoming law is just as you described, that is, the farmer can use all that water. And he said Montana law is uncertain, but Wyoming law is not out of line with the general approach. Suppose it had been a case, suppose Montana law, instead of being uncertain, was diametrically opposite Wyoming law, then what happens under this compact? Jay, under this compact, Justice Ginsburg, the appropriative rights existing in each signatory State as of January 1, 1950 are water preserved and carried forward by Article 5a. Each water user in each State has exactly the same rights that he had on January 1, 1950. Now, in Montana, perhaps that might not include the right to recapture efficiencies, but we know, for example, that a Montana water user could divert more water per acre because Montana had a more generous concept of beneficial use for irrigation per acre than Wyoming did. The compact simply carries forward all existing appropriative rights, and the drafters consciously rejected the idea that they should come up with some kind of interstate administration system putting the two States' rights on an equal footing. They carried forward each element in the bundle of sticks that a rights holder had on January 1, 1950, subject to the single override of the definition of beneficial use. And I'd like to turn to that, because Justice Scalia's colleague with Mr. Michael brought that out. In Article 2h, there is a definition of beneficial use. What the compact definition of beneficial use does is specify that non-depletive uses don't count. Hydropower is a classic example. Hydropower in the main channel is something that one could get an appropriative right for under some Western water law. Kennedy, could you do this, and this is 2? 2h, which is on page A4 to the appendix of the Special Master's Report. That's the definition of beneficial use. What it does not do is specify that depletion is the measure of beneficial use. It says beneficial use is not the use to the extent that the water supply is depleted. It's the use by the water supply is depleted. Because irrigation means water goes out and doesn't come back, and some of it doesn't come back, irrigation is a depletive use. It's recognized by the compact. Scalia, but a mill race would, Justice Scalia. A mill race takes water out of the river and you turn your, the wheel of your grist mill with it, but then, and then the water comes back to the river. Well, but that's a diversion. Yes, that's a diversion, but not a depletion. It means that taking or removing a water, when the water is so taken or removed, is not returned directly into the channel of the Yellowstone River. So if you have a mill race, the water comes through the mill race, goes right back. It's not even a diversion. You don't have to qualify as a beneficial use. But the point, Justice Scalia, Article 5A doesn't use diversion, and that's precisely the point, right? It doesn't use diversion. It uses beneficial use. And any benefit. Why doesn't it use diversion, if it means what you say? Because they, it didn't use diversion because it wasn't quantifying them. Whereas, what, diversion is used in Article 5B because the diversion is the quantified. Of course it's quantified. I mean, the whole purpose is you can't take any more than you were taking before. It has to be quantified somehow. It's not quantified in the sense, as Justice Breyer pointed out, no one, they didn't write down, especially in Montana, because as the special matter said at page 22, Montana didn't have a centralized system of rights. They didn't know exactly how much was being diverted in Montana. They certainly didn't know how much was being consumed or how much was being returned to the river. Joint Appendix 585, there's a Federal Power Commission report that says that it is almost impossible to make an accurate determination of return flow. So what the drafters did was they, for the pre-1950 rights, they said, we're not going to quantify them at all. We're going to grandfather them in, freeze them in place. Breyer, Your linguistic argument is they didn't use the word diversion because they didn't want to throw the mill race example into the definition. Is that right? My argument, Justice Breyer, is that they didn't want mill races or hydropower to count. They didn't want mill races in the definition, so they purposely didn't use the word diversion. That's why they used the word depletion. They used the word depletion, but they didn't make the amount of depletion the measure of interest. That is the point. A mill race is not a diversion. Correct. And they wanted that. A mill race is a diversion under the common understanding of that term, Justice Scalia. It's not under the definition. Not under the special definition used for Article 5b. But you keep saying everybody gets the same beneficial use they had prior to 1950. But even though that may mean they can't do it. In other words, they may have a right to get 50 cubic whatever for irrigation, but there may not be any water there for them to use it because of the increased efficiencies upstream. That is true, Mr. Chief Justice, but that has always been the case under Western Water Law, that the appropriative right is a priority, that when it's your turn and there's enough water, you get to take the amount of water to which you have a right. But it was clear in Wyoming on January 1, 1950, that the appropriative right, so long as you took the same quantity from the river, you took it from the same point on the river, you put it to the same use, irrigation, on the same acreage, that you could then change crops. In 2H, do you think beneficial use is hereby defined to be that use by which water supply is depleted? When we're looking at depleted, do you define depleted as what is taken without any reference to what is returned? I think that that's right. I think I agree, Justice Kennedy, but it has to be a depleted use in the sense that some water has to come out that doesn't come back. So it's not the same. A mill raise is not a depletion, even though some water comes out because it then comes back. Kennedy. Kennedy. I mean, that's the key to this case, I take it. Wyoming is telling us that what goes back is irrelevant, so long as what is taken is for a recognized beneficial use. The reason it's irrelevant, Justice Kennedy, is for two reasons. Depletion is not the measure of beneficial use. It is a criterion for beneficial use. The use has to be a depleted one. But it's not the measure of the beneficial use. And the second point, Montana seeks to equate consumption with depletion. And that's not correct either. We urge the Court to overrule the exception. Thank you, Mr. Chief. Roberts. Roberts. Roberts. General, you have two minutes left. Chief Justice, members of the Court, briefly that, as Justice Scalia pointed out, this is a compact, and it's a compact between two different States. And Montana gave up things, a right of priority administration across State lines as a result of that. Justice Breyer, as an issue of fairness, we don't get all the water. We only get water supply under like conditions. We are now the downstream appropriator. So as one example, if half the water is flowing now that it was as of 1950, Montana may not get anything at that point, because just by the virtue of some say it's hyology, whoever is higher on the river gets to take first. So we don't get to fulfill our rights. All we get is to ensure that, given a like supply of water, that our rights shall continue to be enjoyed as have existed as of 1950. How many years has there been not enough water to fill all pre-1950? Forget about whether there was post-1950 use. How many years are we talking about in which there's been not enough water to fill everybody's? And, Your Honor, we've done no discovery at all. This is still at the motion to dismiss complaint. And that's what the hydrologists and the engineers will ultimately determine. We made calls in 2004 and 2006. We said, wait a minute, we're not getting enough water here. And we believe it's the pre-1950 uses that are depleting that. Will you give us water? Ultimately, why we're here is to sort this out. I guess I'd also point out that there was some discussion about appropriative right is the right to use a quantity of water. That makes sense, other than if you're in a compact and Montana gets no water. The Solicitor General even pointed out then in his brief at a footnote, he said, well, what we might do then is that Montana could bring an equitable portionment action for the pre-1950 water. That highlights the, I think to me, the illogic of just focusing on the rights and not looking at the uses and how much each State was consuming, because at that Thank you, General Counsel. The case is submitted.